

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 0 2006

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
Civil Division

| | |
|---|---|
| AUNYSTI BANKS, A MINOR,<br>by her Guardian of the Estate<br>Citizens Bank of Batesville, Arkansas,<br>200 South Third, P.O. Box 2156, Batesville,<br>Arkansas 72503<br><br>and<br><br>ARKANSAS DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES<br>700 Main Street<br>P. O. Box 1437 - Slot S260<br>Little Rock, Arkansas 72203-1437<br><br>    Plaintiffs,<br><br>    v.<br><br>HAROLD B. COLLINS, M.D.<br>8229 Donaway Court<br>Brentwood, Tennessee, 37027<br><br>and<br><br>AMY CATHERINE EBLE, M.D.<br>F/K/A AMY WEIDOWER-LAMB, M.D.<br>F/K/A AMY WEIDOWER, M.D.<br>3027 Aspen Lane<br>Manvel, Texas 77578<br><br>    Defendants | **COMPLAINT FOR DAMAGES**<br><br>Personal Injury Action (28 U.S.C. §1332)<br><br>[DEMAND FOR JURY TRIAL]<br><br>Civil Action No. 4-06-CV-0322 GH<br><br>This case assigned to District Judge Howard<br>and to Magistrate Judge Forster |

## COMPLAINT AND JURY DEMAND

Plaintiffs, Aunysti Banks, a minor, by her Guardian of the Estate Citizens Bank of Batesville, Arkansas, The Arkansas Department of Health and Human Services, by their attorneys,

and for their Complaint, state:

1. This is an action for medical injury pursuant to Arkansas Code Annotated § 16-114-201, et. seq.

2. At all times relevant to this action, Plaintiff, Aunysti Banks, a minor, was a citizen and resident of White County, Arkansas, and Lonoke County, Arkansas, residing there with her natural parents Edwanna Banks and Charles Banks, Jr., who at all times relevant to this action, were citizens and residents of White County, Arkansas and/or Lonoke County, Arkansas. Edwanna Banks, Charles Banks, Jr., and Plaintiff Aunysti Banks, a minor, currently reside in Lonoke County, Arkansas.

3. On or about March 8, 2006, the Circuit Court of Lonoke County, Arkansas, Probate Division, appointed Citizens Bank of Batesville, Arkansas, as Permanent Guardian of the Estate of the minor infant, Aunysti Banks for the purposes of this lawsuit. See Order, attached hereto as Exhibit A. That Order is incorporated as if set forth fully herein. At all times relevant hereto, Citizens Bank of Batesville, Arkansas, was an entity licensed and existing under the laws of the State of Arkansas, and as the duly appointed Guardian of the Estate of Aunysti Banks, is a proper party to this lawsuit.

4. At all times relevant hereto, Plaintiff The Arkansas Department of Health and Human Services was an entity licensed and existing under the laws of the State of Arkansas, and was and is providing medical expense coverage for Aunysti Banks, a minor, pursuant to Arkansas law. Such coverage has been and will continue to be available to Aunysti Banks, a minor, through the age of her majority. Plaintiff The Arkansas Department of Health and Human Services has a right to be reimbursed for any funds its spends on Aunysti Banks's care. As such, The Arkansas Department

of Health and Human Services is a proper party to this lawsuit.

5. At all pertinent times, Defendant, Harold B. Collins, M.D., (hereinafter "Dr. Collins"), was licensed to practice medicine and engaged in the practice of medicine in the State of Arkansas in the field of obstetrics and gynecology. Defendant Dr. Collins held himself out to Edwanna Banks and the Plaintiffs in particular and the public in general as being an able and skilled physician possessing the same or higher level of skill and training as other members in his profession and that he was well able to render proper and adequate obstetrical care and treatment to Edwanna Banks and Aunysti Banks at all times. Upon information and belief, Dr. Collins now resides in the State of Tennessee.

6. At all pertinent times, Defendant, Amy Catherine Eble, M.D. f/k/a Amy Weidower-Lamb, M.D., f/k/a Amy Weidower, M.D., (hereinafter "Dr. Weidower"), was licensed to practice medicine and engaged in the practice of medicine in the State of Arkansas in the field of obstetrics and gynecology. Defendant Dr. Weidower held herself out to the Plaintiffs in particular and the public in general as being an able and skilled physician possessing the same or higher level of skill and training as other members in her profession and that she was well able to render proper and adequate obstetrical care and treatment to Plaintiffs Edwanna Banks and Aunysti Banks at all times. Upon information and belief, Dr. Weidower was a resident in the obstetrical/gynecological department at UAMS. Upon further information and belief, Dr. Weidower now resides in the State of Texas.

7. The conduct which gives rise to this action for medical injury occurred in Pulaski County, Arkansas.

## JURISDICTION AND VENUE

8. This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332 (diversity of citizenship). The matter in controversy in this civil action exceeds the sum or value of $75,000, exclusive of costs and interests, as to each defendant, and is between citizens of different states.

9. Venue in this District is proper under 28 U.S.C. §1391. The events giving rise to this cause of action occurred in this District, where defendants transact business or transacted business at the time.

10. A related action was previously filed in the Circuit Court for White County, Arkansas, styled Aunysti Banks, a minor, by her parents and next friends, Edwanna Banks and Charles Banks, Jr., and Edwanna Banks and Charles Banks, Jr., Individually v. Harold Collins, M.D., Cullen Dale Fuller, M.D., Amy Catherine Eble f/k/a Weidower-Lamb, M.D., Christy Walker, M.D., and Kimberly J. Farmer, M.D., Case No. 2003-805. That matter was voluntarily non-suited without prejudice by Order dated March 14, 2005. The filing of this current action has been done within the applicable time limits under Arkansas law.

## FACTUAL ALLEGATIONS

11. On or about June 18, 2001, the records indicate that Edwanna Banks (then known as Edwanna Davis, but hereinafter referred to as "Ms. Banks") presented to the Health Department for prenatal care. Those records indicate a due date of October 23, 2001. On or about August 6, 2001, Ms. Banks presented to the White County Medical Center emergency room believing she was pregnant. She was diagnosed by ultrasound as being six weeks six days gestation. She presented again to the White County Medical Center emergency room on August 19, 2001, with

back pain and suicidal ideation. She was discharged in stable condition.

12.     It appears she began her prenatal care with the Lonoke Health Department, upon information and belief run by and/or through University of Arkansas Medical Services (hereinafter "UAMS"), on or about October 29, 2001. It was noted that there was a questionable last menstrual period of June 25, 2001, which was charted as having an estimated due date of April 1, 2002.

13.     On or about November 6, 2001, Ms. Banks presented to UAMS with possible contractions. It was charted that Ms. Banks reported she was 39 weeks gestation with a last menstrual period of January 15, 2001. An ultrasound was performed by Dr. Weidower, which demonstrated Ms. Banks's gestational age at 19 and 6/7 weeks, with an estimated date of confinement (delivery or due date) of March 28, 2002. She was released with directions to follow-up at her prenatal clinic.

14.     Ms. Banks went the next day, November 7, 2001, to the Lonoke Health Department for her prenatal care. Her clinic noted that she was 19 weeks by estimated gestational age (estimated from the time of her last period) but was 27 centimeters by fundal height (measurement of the stomach area that is to approximately mirror the gestational age estimates), and noted this as size greater than dates. The Lonoke Health Department noted that Ms. Banks had gone to UAMS the day before, had an ultrasound performed, and a due date of February 3, 2001 [sic]. They made a note to obtain the ultrasound report from UAMS and faxed releases to UAMS for this report.

15.     Ms. Banks was again seen on November 21, 2001, and November 28, 2001, at Lonoke Health Department where the differences in gestational age and fundal height

measurements were again inconsistent, and noted question marks next to her weeks gestation. At the November 28th visit, her prenatal care providers properly referred Ms. Banks for an ultrasound, which appears to have been scheduled for December 11, 2001.

16. At some point around this time in 2001, the Lonoke Health Department provided a copy of her prenatal chart to Ms. Banks so that she could bring those documents to her delivery hospital when she was ready to deliver.

17. On or about November 28, 2001, Ms. Banks presented to the emergency room at Baptist Memorial Medical Center. They admitted her to labor and delivery, found that everything was fine, and discharged her home.

18. On or about November 30, 2001, Ms. Banks presented to the emergency room at Baptist Memorial Medical Center, with complaints of possible active labor and being 39 weeks gestation. The emergency room physician did a vaginal exam and found her to be 2-3 cm dilated and 50 percent effaced. She was transferred to the labor and delivery floor, where she was seen by Dr. Cullen Dale Fuller, who found her to have a fundal height measurement of 35 cm, to have no effacement (meaning dilation of her cervix had not occurred) and a closed cervix, that she was 34 weeks gestation, and not in labor. She was discharged with instructions to return to her prenatal care provider and to deliver at a tertiary center due to myasthenia gravis and complications related to that condition.

19. On or about December 3, 2001, Ms. Banks presented to her prenatal care provider at Lonoke Health Department and informed them that she had been seen at Baptist Memorial Medical Center and to return to have the fetal heart tones measured.

20. On or about December 3, 2001, Ms. Banks presented to UAMS complaining

of decreased fetal heart tones. Ms. Banks was seen by Dr. Christy Walker, a first year intern, who performed an examination of Ms. Banks. The prenatal records from Lonoke Health Department were provided to and reviewed by Dr. Walker. Dr. Collins was the attending physician on this date. It was first noted in the records that Ms. Banks was 40 weeks gestation, which was scratched out and 38 weeks by 16 week ultrasound was inserted, with an estimated date of confinement of December 16, 2001, and a last menstrual period of March 2001. Dr. Walker performed a non-stress test, which she found to be non-reactive, and in consultation with Dr. Kimberley Farmer, a fourth year resident at UAMS, admitted Ms. Banks for prolonged monitoring and possible cesarean section. Dr. Farmer then had a Dr. Shakir, a second year resident at UAMS perform a bio-physical profile ("BPP"). A BPP is a test that examines the health and well-being of the fetus in utero and is scored on a scale of zero to ten, with ten being the most reassuring of fetal well being. After performing the BPP, Dr. Shakir interpreted the BPP results as an 8 out of 10, with a zero score assigned for the fetal non stress test, but twos for each of the following: breathing, limb movement, amniotic fluid index, and body flex extend. Dr. Farmer made the decision to discharge the patient home with a follow-up visit scheduled on December 6, 2001, to the clinic. No fetal monitoring tracings have been provided by UAMS.

21.     Despite the ultrasound performed at UAMS on November 6, 2001, that demonstrated Ms. Banks was only 19 weeks gestation at that point, it appears the health care providers ignored this report or failed to see it at all. This was a violation of the standard of care. At this point, the standard of care required the health care providers to review the ultrasound report of November 6, 2001, and the accompanying medical records. Had the health care providers reviewed the ultrasound report and/or the medical records of November 6, 2001, to comport with the standard of care it would have lead them to do additional testing and examinations on Ms. Banks,

including ultrasounds. More likely than not, the additional testing and prenatal records would have clearly demonstrated that Ms. Banks was not 38 weeks gestation, but only around 23 weeks gestation, and thus, was carrying a premature fetus that should not have been delivered.

22. On or about December 6, 2001, Ms. Banks presented to UAMS with complaints of decreased fetal movement. Dr. Weidower examined Ms. Banks and reviewed her prenatal records that were provided. The prenatal records that were in the possession of UAMS demonstrate that various entries were altered, with these alterations making Ms. Banks's pregnancy appear full term, or further along than she really was. These alterations were open and obvious and there were numerous inconsistencies among these alterations and records that would have made a reasonably prudent health care provider question the reliability or authenticity of these records as required by the standard of care. Instead, Dr. Weidower and the other health care providers found nothing suspicious about the prenatal records and continued to treat Ms. Banks as if she was full term (gestational age 36 weeks or greater).

23. On this December 6, 2001, date, Dr. Weidower performed another BPP, again scoring an 8 out of 10. Dr. Weidower further, even though she was the one who performed the ultrasound on this patient on November 6, 2001, failed to have that November 6, 2001, prior record made available to her as required by the standard of care. Dr. Weidower should have determined that Ms. Banks was not full term given the testing that she performed as well as her examinations and prenatal records. In fact, the altered records refer to ultrasounds having been performed at UAMS. This was a violation of the standard of care not to obtain these records or question the prenatal records. At this point, the standard of care required the health care providers to review the ultrasound report of November 6, 2001, and the accompanying medical records. Had the health care providers reviewed the ultrasound report and/or the medical records of November 6, 2001, and/or

-8-

questioned the prenatal record inconsistencies, to comport with the standard of care it would have lead them to do additional testing and examinations on Ms. Banks, including ultrasounds. More likely than not, the additional testing and prenatal records would have clearly demonstrated that Ms. Banks was not 38 weeks gestation, but only around 23 weeks gestation, and thus, was carrying a premature fetus that should not have been delivered.

24.     Instead, Dr. Weidower discharged Ms. Banks home, scheduled a caesarean section for December 10, 2001, and provided Ms. Banks with directions to return for that scheduled elective caesarean section on December 10, 2001.

25.     On or about December 10, 2001, Ms. Banks presented to UAMS for her scheduled caesarean section. She was examined and treated by Dr. Weidower and Dr. Collins prior to being prepped for the cesaerean section, which was then performed by Dr. Walker with Drs. Weidower and Collins watching and instructing. The records indicate that Drs. Weidower and Collins considered Ms. Banks to be 39 weeks gestation. Once again, despite the ultrasound performed at UAMS on November 6, 2001, that demonstrated Ms. Banks was only 19 weeks gestation at that point, it appears the health care providers ignored this report or failed to see it at all. This was a violation of the standard of care. At this point, the standard of care required the health care providers to review the ultrasound report of November 6, 2001, view the accompanying medical records, and perform proper examinations on Ms. Banks. Had the health care providers reviewed the ultrasound report and/or the medical records of November 6, 2001, and/or performed proper examinations, to comport with the standard of care it would have lead them to do additional testing and examinations on Ms. Banks, including ultrasounds. Furthermore, prior to performing the caesarean section on December 10, 2001, the standard of care required the health care providers to obtain Ms. Banks's prenatal records from the prenatal care facility given the obvious and open

Case 4:06-cv-00322-GH   Document 1   Filed 03/10/06   Page 10 of 18

alterations and inconsistencies in the prenatal records. More likely than not, the additional testing and prenatal records would have clearly demonstrated that Ms. Banks was not 38 weeks gestation, but only around 24-25 weeks gestation, and thus, was carrying a premature fetus that should not have been delivered by a scheduled cesarean section. Had the standard of care been adhered to, more likely than not, Ms. Banks would not have undergone a caesarean section on December 10, 2001, but would have been monitored until her baby was term (gestational age 36 weeks or greater). Dr. Collins noted "good dating criteria" and, as the attending, then gave permission for the scheduled caesarean section to go forward.

26. Apparently committed to delivering Ms. Banks irrespective of what the records indicated, Ms. Banks was prepped and a caesarean section was performed on December 10, 2001. Not surprisingly, the intraoperative record noted that the "baby [was] obviously not 39 weeks." Drs. Weidower and Collins further violated the standard of care in not properly instructing and overseeing this operation performed by Dr. Walker, which had they done so, the surgery could have been discontinued prior to Dr. Walker cutting through into the uterus. In fact, the lower uterine segment was described as "poorly developed', which, had Drs. Weidower and Collins adhered to the standard of care, they would have recognized, stopped the caesarian section, and taken Ms. Banks and her fetus back for further testing, which would have revealed a premature fetus, and the baby would have remained healthy and intact in utero, as described in detail above. Instead, Drs. Weidower and Collins allowed Dr. Walker to cut through into the uterus, at which point the only option available was to deliver the baby.

27. The progress notes after the delivery indicate that there was obvious falsification of the records.

28. Aunysti Banks was born by caesarean section at 9:37 a.m. on December 10,

-10-

2001, and weighed under 2 pounds. The health care providers, not surprisingly, immediately discovered that Aunysti was not 39 weeks gestation but rather was about 24-25 weeks gestation, an extremely premature infant. Aunysti's Apgar scores (a zero to ten scale used to measure the well-being of a newborn) were extremely low. She had a 1 Apgar score at one minute, a 1 Apgar at five minutes, a 3 Apgar at ten minutes, and a 3 Apgar at 15 minutes. She was rushed to the neonatal intensive care unit and treated for prematurity. She was diagnosed with, among other things, an intraventricular hemorrhage, grade 4/grade 3.

29. The violations of the standard of care by Drs. Weidower and Collins, including but not limited to, their failure to properly examine and confirm records and to properly supervise, caused Aunysti to suffer prematurity, hyaline membrane disease status post Servante, intraventricular hemorrhage, pneumonia, patent ductus arteriosis, hyperbilirubinemia, sepsis, breathing and respiratory problems, the need to be intubated, placement of umbilical artery and venous catheters, mental retardation, physical impairments, and suffer other injuries. But for the violations of the standard of care by the defendants, Aunysti Banks would be normal.

## CLAIMS FOR RELIEF
### First Claim Against All Defendants
### (Negligence)

30. Plaintiffs reallege all previous paragraphs.

31. The injuries to Aunysti Banks as are here and after more fully set forth were directly and proximately caused by the failure of Defendant Harold B. Collins, M.D. to possess and employ with reasonable care, the skill and learning ordinarily possessed by physicians engaged in practicing and providing obstetrical medicine to individuals in Little Rock, Arkansas, or a similar locality, during the pregnancy of Edwanna Banks and delivery of her daughter, Aunysti Banks, in one, more, and/or all the following particulars, to-wit:

A. Defendant negligently failed to appropriately manage Edwanna Banks's pregnancy;

B Defendant negligently delivered Aunysti Banks by a scheduled cesarian section when the fetus was only approximately 24-25 weeks gestation:

C. Defendant negligently failed to establish and/or follow appropriate polices, procedures and practices to address properly the needs of patients such as Ms. Banks and her fetus;

D. Defendant negligently failed to properly supervise and provide adequate training to residents, interns, and/or nurses, including before and during the performance of the elective caesarean section;

E. Defendant negligently failed to properly diagnose Edwanna Banks's and her fetus's conditions;

F. Defendant negligently failed to properly treat Edwanna Banks's and the fetus's conditions;

G. Defendant negligently failed to properly obtain and/or review prenatal medical records prior to performing an elective caesarean section;

H. Defendant negligently failed to properly identify and resolve any inconsistencies in determining the gestational age of the fetus prior to performing a caesarean section;

I. Defendant negligently failed to properly identify and resolve any inconsistencies in the medical records prior to performing an elective caesarean section;

J. Defendant negligently failed to properly identify and discover that the fetus was only 23-25 weeks gestation and not full term prior to performing an elective caesarean section;

K. Defendant negligently failed to confirm gestational age by ultrasound and/or

other proper examination;

      L.     Defendant negligently failed to properly investigate and examine Ms. Banks;

      M.    Defendant negligently failed to properly obtain and/or review prior visit medical records prior to scheduling and performing an elective caesarean section; and

      N.     Defendant negligently otherwise failed to adhere to the applicable standards of care and were otherwise careless and negligent.

      32.    The injuries to Aunysti Banks as are here and after more fully set forth were directly and proximately caused by the failure of Defendant Amy Catherine Eble f/k/a Amy Weidower-Lamb, f/k/a Amy Weidower, M.D. to possess and employ with reasonable care, the skill and learning ordinarily possessed by physicians engaged in practicing and providing obstetrical medicine to individuals in Little Rock, Arkansas, or a similar locality, during the pregnancy of Edwanna Banks and delivery of her daughter, Aunysti Banks, in one, more, and/or all the following particulars, to-wit:

      A.     Defendant negligently failed to appropriately manage Edwanna Banks's pregnancy;

      B      Defendant negligently delivered Aunysti Banks by a scheduled cesarian section when the fetus was only approximately 23-25 weeks gestation:

      C.     Defendant negligently failed to follow appropriate polices, procedures and practices to address properly the needs of patients such as Ms. Banks and her fetus;

      D.    Defendant negligently failed to properly diagnose Edwanna Banks's and her fetus's conditions;

      E.     Defendant negligently failed to properly treat Edwanna Banks's and the fetus's conditions;

F. Defendant negligently failed to properly obtain and/or review prenatal medical records prior to performing a caesarean section;

G. Defendant negligently failed to properly obtain and/or review prior visit medical records prior to scheduling and performing an elective caesarean section;

H. Defendant negligently failed to properly identify and resolve any inconsistencies in determining the gestational age of the fetus prior to performing an elective caesarean section;

I. Defendant negligently failed to properly identify and resolve any inconsistencies in the medical records prior to performing an elective caesarean section;

J. Defendant negligently failed to properly identify and discover that the fetus was only 23-25 weeks gestation and not full term prior to performing an elective caesarean section;

K. Defendant negligently failed to confirm gestational age by ultrasound and/or other proper examination or see what was there to be seen;

L. Defendant negligently failed to properly investigate and examine Ms. Banks;

M. Defendant negligently failed to properly supervise and provide adequate training to Dr. Walker, including before and during the performance of the elective caesarean section; and

N. Defendant negligently otherwise failed to adhere to the applicable standards of care.

33. But for the negligence of Defendants, jointly and severally, the injuries and damages of Plaintiffs (described in this Complaint) would not have occurred. Furthermore, the injuries and damages of Plaintiffs (described in this Complaint) would not have occurred had Defendants, jointly and severally, acted in accordance with the standards of care required of

physicians engaged in obstetrical/gynecological care in Little Rock, Arkansas or in a similar locality.

34. As a direct and proximate result of the Defendants' negligence, jointly and severally, Plaintiff, Aunysti Banks, suffered prematurity, hyaline membrane disease status post Servante, intraventricular hemorrhage, pneumonia, patent ductus arteriosis, hyperbilirubinemia, sepsis, breathing and respiratory problems, mental retardation, physical impairments, poor motor skills, and other permanent and disabling injuries, including but not limited to physical injury, great pain and mental anguish experienced in the past and which will continue to be experienced in the future, disfigurement, diminished quality of life, past, present and future medical and related expenses, a loss of earnings and earnings capacity, the need for special equipment and devices to help compensate for her impairments and/or disfigurement, the need for special schooling and housing due to her impairments, and other damages.

35. Moreover, as a direct and proximate result of the negligently inflicted injuries to Aunysti Banks, a minor, described above, Plaintiff The Arkansas Department of Health and Human Services has suffered damages as the entity responsible for medical expenses for Aunysti Banks. Particularly, The Arkansas Department of Health and Human Services has incurred medical and rehabilitation expenses in the past and will continue to incur such expenses in the present and future.

### PRAYER FOR RELIEF

36. WHEREFORE, Plaintiffs seek judgment in their favor against the defendants, jointly and severally, as follows:

    a. Economic and non-economic damages in an amount in excess of $75,000 as to each defendant as provided by law and to be supported by the evidence at trial;

    b. An award of attorneys' fees and costs of suit, as provided by law; and,

    c. Such other legal and equitable relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs, Aunysti Banks, a minor, by and through Citizens Bank of Batesville, Arkansas, as Permanent Guardian of the Estate and The Arkansas Department of Health and Human Services, hereby demand a jury trial on all claims so triable in this action.

Respectfully submitted,

CLOAR LAW FIRM

Ralph M. Cloar, Jr.
Prospect Bldg., Suite 640
1501 N. University Avenue
Little Rock, Arkansas 72207-5235
Tel: (501) 666-6682
Fax: (501) 666-6822


JANET, JENNER & SUGGS, LLC
Kenneth M. Suggs (*pro hac vice* pending)
Christian C. Mester (*pro hac vice* pending)
Maria H. Dawson (*pro hac vice* pending)
1829 Reisterstown Road, Suite 320
Baltimore, Maryland 21208
Tel: (410) 653-3200
Fax: (410) 653-6903

and

ARKANSAS DEPARTMENT Of HEALTH
AND HUMAN SERVICES

Richard B. Dahlgren, Esquire
Office of Chief Counsel
700 Main Street
P. O. Box 1437 - Slot S260
Little Rock, Arkansas 72203-1437
Tel: (501) 682-8600
Fax: (501) 682-8009
Attorneys for Plaintiffs

FILED

MAR 0 8 2006

LONOKE CO. CLERK PRUDIE PERCEFU

IN THE CIRCUIT COURT OF LONOKE COUNTY, ARKANSAS
PROBATE DIVISION

| IN THE MATTER OF | * | Case No. 2004-225 |
| AUNYSTI BANKS, | * | |
| An Incapacitated Person | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER APPOINTING PERMANENT GUARDIAN OF THE ESTATE

On this day was presented to the Court the Petition for Appointment of Guardian of the Estate, from which this Court, being well and sufficiently advised in the premise, does find, order and adjudge as follows:

1.  That Petitioners are the parents and natural guardians of Aunysti Banks, a minor, whose date of birth is December 10, 2001;

2.  That Aunysti Banks resides with Petitioners in Lonoke, Lonoke County, Arkansas;

3.  That on or about September 27, 2004, this Court Ordered that The Citizens Bank of Batesville, Arkansas be appointed as guardian of the estate of Aunysti Banks, a minor, for the purpose of prosecuting a medical negligence action on behalf of Aunysti Banks as well as manage any assets received by or on behalf of Aunysti Banks as a result of the medical negligence action;

4.  That state case was non-suited by way of Order dated March 12, 2004, in the Circuit Court for White County, Arkansas;

5.  That the only asset owned by the incapacitated person is a cause of action for medical negligence against Harold B. Collins, M.D., and Amy Weidower-Lamb, M.D., and possibly others, and it is the intent of Aunysti Banks to file this lawsuit presently in the United States District Court for the Eastern District of Arkansas, the approximate value of which is unknown;

-4-



EXHIBIT A

6. It is the desire of Petitioners and The Citizens Bank of Batesville, Arkansas, that The Citizens Bank of Batesville, Arkansas continue to remain appointed as guardian of the estate of Aunysti Banks because of its experience and expertise in serving as personal representative and trustee of assets in this federal lawsuit against these health care providers;

7. That The Citizens Bank of Batesville, Arkansas should be, and hereby is, appointed guardian of the estate of Aunysti Banks for the sole purpose of prosecuting the aforementioned medical negligence action on behalf of Aunysti Banks in the United States District Court for the Eastern District of Arkansas as well as manage any assets received by or on behalf of Aunysti Banks as a result of the medical negligence action because of its experience and expertise in serving as personal representative and trustee of assets;

8. That the street address and post office address of The Citizens Bank of Batesville, Arkansas is 200 South Third, P.O. Box 2156, Batesville, Arkansas 72503;

9. No bond be required of Petitioners.

IT IS SO ORDERED.

ORIGINAL SIGNED BY:
PHILLIP T. WHITEAKER
CIRCUIT JUDGE, DIV. II
LONOKE COUNTY, ARKANSAS

CIRCUIT JUDGE

Date: 3-8-06